KOMATSU DRESSER COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION et al. (Peter J. Lishamer, Sr., Appellee).

Second District (Industrial Commission Division)   No. 2—91—1237WC

Opinion filed October 8, 1992.

STOUDER, J., dissenting.

Mark A. Braun, of Braun, Lynch, Smith & Strobel, of Chicago, for appellant.

Vito D. DeCarlo, P.C., of Chicago, for appellee.

JUSTICE H. LEWIS delivered the opinion of the court:

Claimant, Peter J. Lishamer, Sr., filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Ill. Rev. Stat. 1989, ch. 48, par. 138.1 *et seq.*), for a lower-back injury incurred while in the course of his employment with the respondent, Komatsu Dresser Company. Subsequently, the claimant filed a section 19(b–1) (Ill. Rev. Stat. 1989, ch. 48, par. 138.19(b–1)) petition. Following the hearings on his section 19(b–1) petition, the arbitrator held that the claimant failed to prove that his injury arose out of and in the course of his employment on March 22, 1989, and denied the claimant benefits. On appeal to the Industrial Commission (the Commission), the Commission reversed the decision of the arbitrator and held that the claimant had sustained an accidental injury arising out of and in the course of his employment and awarded the claimant temporary total disability (TTD) benefits for 37 6/7 weeks and medical expenses of $622. The circuit court confirmed the Commission's decision, and the respondent appeals.

On appeal, the respondent contends that the Commission's decision that the claimant's lower-back injury was causally connected to his employment was against the manifest weight of the evidence and that the Commission failed to give due deference to the arbitrator's decision and, specifically, to the arbitrator's determination of the witnesses' credibility. We affirm for the reasons set forth below.

At the arbitration hearing on May 11, 1990, the claimant testified that he had worked as a machinist since 1973, and on March 22, 1989, he was so employed by the respondent. His job duties as a machinist consisted of turning raw metal into usable parts for tractors built at the respondent's plant. To accomplish this task, the claimant lifted parts weighing between 30 and 40 pounds from a box located next to his machine and placed the parts into the ma-

chine for processing. The box containing the parts was on a skid, which placed the box waist high and required the claimant to bend from his waist to lift the part out of the box.

The claimant testified that on March 22, 1989, he was working the second shift, *i.e.*, from 3:30 p.m. to midnight, and at about 10 p.m., he bent over to pick up a part out of the box, felt a sharp pain at the "bottom" of his back, and simultaneously sneezed, which caused the pain to spread throughout his entire lower back. At the time of the incident, the claimant explained that the box containing the parts was three-quarters empty as he had been at work for six hours. Following this incident, the claimant straightened up and sat down at his workbench.

Sometime between 10:30 p.m. and 11 p.m., the claimant's foreman, Les Lagoo, came by the claimant's machine to obtain a production count. At this time, the claimant advised the foreman that he had felt a sharp pain in his back when he bent over to obtain a part from the box and that he sneezed and felt the pain spread throughout his back. When the foreman asked if he was all right, the claimant responded that he thought so, but that he would just sit until his shift ended, if his production for the day was sufficient. The foreman agreed, so the claimant sat at his workbench the remaining hour of his shift.

When the claimant left work to go home, he was still in pain, and he had difficulty getting in and out of the car. The following morning, the claimant was unable to get out of bed due to the pain in his back. The claimant's wife arrived home from work around noon, helped him out of bed, and took him to St. Therese's Medical Center. At St. Therese's, he was given pain medication and muscle relaxants and was advised to alternate heat and cold packs on his back. He was also told to stay off work for a week.

That same day, the claimant called Jane Webber, the respondent's nurse, and told her he had injured his back the previous evening when he bent over and sneezed. Webber advised him to come in and see the company doctor, Dr. Loyd, on the following Tuesday, since the weekend was a holiday. The claimant saw Dr. Loyd as requested, and the doctor increased the dosage of his pain medication and his muscle relaxants. Dr. Loyd told him he could return to work on March 31, 1989.

The claimant returned to work on March 31, 1989, and the foreman assigned him to the floor sweeper that day. This work required the claimant to sit on the machine, but after a half hour, because the floor was rough and the sweeper had no suspension, the claim-

ant stopped working due to the pain in his back. The claimant left work after four hours.

The following day, April 1, 1989, the claimant went to see Dr. Maniquis. Dr. Maniquis took X rays, prescribed medication, and recommended that he start physical therapy in a week or so. Dr. Maniquis released him for light-duty work as of May 29, 1989, with the restriction of no bending, twisting or stooping and with a lifting restriction of 20 pounds. The doctor also advised him not to work on the floor sweeper. The claimant called the company nurse and advised her that the doctor had released him for light-duty work; however, Webber told the claimant the respondent had no work for him with those restrictions.

In July 1989, both Dr. Maniquis and the company physician released the claimant for light-duty work, with a lifting restriction of 35 pounds and no bending, twisting or stretching. Again the claimant was advised that the respondent had no work for him with these restrictions. The claimant had not returned to work at the time of the arbitration hearing. In addition to Dr. Maniquis and Dr. Loyd, the claimant had been to Drs. Apfelbach and Pawl at the respondent's request.

The claimant testified that, currently, he has constant pain at the base of his spine and in his left thigh. He explained that sometimes the pain is worse than others, and that there is no explanation as to the cause of the pain.

On cross-examination, the claimant admitted there were no witnesses to his accident. The claimant denied that he told the company nurse that he had hurt his back when he sneezed and before bending over to pick up a part. The claimant stated that at the time of his injury he weighed 330 pounds. Further, the claimant admitted that in November 1989 his back "went out" when he attempted to hang a picture frame at home. In addition, the claimant testified that he had had two prior back injuries, one in 1978 and one in 1987, but he had not missed any work and he had not filed a worker's compensation claim for these injuries.

Jane Webber, the respondent's nurse, testified that she had talked to the claimant in March 1989 about his medical condition. It was her recollection that the claimant had told her, in a phone conversation on March 23, 1989, that he had hurt his back when he had sneezed on the previous night and that he was unable to come to work. She instructed the claimant to see Dr. Loyd on the following Tuesday. She stated that it was her method of making notes

when she placed the word "sneezed" in parenthesis above her written notes in the claimant's charts in March 1989.

Leslie Lagoo, the claimant's foreman, testified that on the evening of March 22, 1989, at about 11 p.m., the claimant told Lagoo that he had bent over the box to obtain a part, sneezed and felt a pain in his back. Lagoo corroborated the claimant's testimony that the claimant asked to sit the remainder of his shift. Lagoo's testimony also confirmed the claimant's testimony that the parts used in the claimant's machine were kept in a waist-high box and that the usual procedure to obtain a part was to bend over the box and pick up the part.

Two evidence depositions and various medical reports were admitted into evidence. Dr. Maniquis testified in his evidence deposition that he had treated the claimant in the past, when he was the respondent's physician from 1974 to 1987. He next saw the claimant on April 1, 1989, for a lower-back injury. At that time, the claimant told the doctor he had injured his back at work on March 22, 1989, when he bent over to pick up a part, sneezed and felt pain in his lower back. According to Dr. Maniquis, the claimant had attempted to return to work after a week but left when his back started hurting again.

When Dr. Maniquis saw the claimant, the claimant had leg pains and some numbness over the lateral aspect of his thigh. Dr. Maniquis' examination of the claimant revealed that he weighed 290 pounds, he had limited flexion in his back, he had tenderness on palpation of the left sacroiliac and in the lumbosacral area, and the muscles around the claimant's spine were tight on palpation. Dr. Maniquis had X rays taken of the claimant's lower back. The doctor took the claimant off work, and, subsequently, he ordered physical therapy for the claimant. The claimant's back pain improved, and in May 1989, the doctor released the claimant for work with the restrictions of a lifting limit of 20 pounds, and no bending, twisting or stooping. The doctor also advised the claimant not to drive a sweeper. The doctor was aware that the claimant did not return to work at that time because there was no job available with those restrictions.

The doctor again released the claimant for work in July 1989, but with a lifting restriction of 35 pounds and no bending, twisting or stooping, but again the respondent was unable to offer the claimant work with these restrictions. When the doctor saw the claimant in November 1989, the claimant told the doctor that his back started hurting again after he attempted to hang a picture frame at

home, so the doctor imposed a 25-pound lifting restriction. The doctor last saw the claimant in December 1989, but the doctor testified he had not lifted the claimant's work restrictions. Dr. Maniquis did not think the claimant could work without restrictions because of the numbness in the claimant's leg and his back pain. The doctor believed these symptoms indicated the claimant had a pinched nerve.

The doctor testified that the claimant had a preexisting condition of spondylolisthesis and spondylosis of the lower lumbar spine. However, his diagnosis of the claimant's condition was low-back-pain syndrome in addition to the preexisting conditions. Dr. Maniquis admitted on cross-examination that it was possible that a sneeze alone could bring about an onset of the claimant's symptoms because of his underlying condition, but he stated that bending and sneezing together placed more stress on the claimant's back than either event would separately. Dr. Maniquis was aware that the claimant's work required him to bend over and pick up parts on a daily basis.

Dr. Apfelbach testified in his evidence deposition that he is an orthopedic surgeon. He had seen the claimant on October 16, 1989, at the request of the respondent's insurance carrier. According to Dr. Apfelbach, his only objective finding of the claimant's condition was that of obesity. He noted that the claimant had a limited range of motion in his back, but he did not find this evidence reliable, as he felt the claimant had control over whether he did these motions to the fullest extent. The doctor did not observe any muscle spasm when the claimant did the range-of-motion tests. Dr. Apfelbach corroborated that the claimant had preexisting conditions of spondylolisthesis and spondylosis. It was Dr. Apfelbach's opinion that the claimant's "backache" was secondary to his spondylolisthesis with his obesity chronically irritating this condition. It was also the doctor's opinion that the claimant could perform his regular work. The doctor found no evidence of nerve irritation or radiculopathy. On cross-examination, the doctor admitted that the claimant's preexisting condition could be temporarily aggravated by bending over to pick up a part and sneezing, but he was of the opinion the aggravation would not be permanent. The doctor did state, "You're not supposed to be bending over all the time, you're supposed to bend your knees when you move."

The medical reports from St. Therese Medical Center indicated that the claimant came to the emergency room on March 23, 1989, for treatment of his lower back. The medical report gave the his-

tory of the claimant's accident at work. The diagnosis of the claimant's condition made at the medical center on March 23, 1989, was acute lumbosacral strain.

The notes from Dr. Loyd, the respondent's company physician, indicated that he had treated the claimant after March 22, 1989, for chronic lumbosacral strain, for which he prescribed medication and physical therapy. The physical therapy notes included in Dr. Loyd's records revealed that the claimant had limited range of motion in his lower back and that he had tenderness in the lumbosacral area upon palpation.

In Dr. Ronald Pawl's letter report of December 7, 1989, the doctor stated that he had examined the claimant on December 1, 1989. In this letter, Dr. Pawl's history of the claimant's accident was substantially similar to the claimant's testimony of his accident at the arbitration hearing. The doctor noted that the claimant complained of low-back pain and numbness and pain in the lateral aspect of his thigh radiating down from his hip to his knee. The doctor found the claimant's past medical and surgical history unremarkable, but the doctor noted the claimant was severely obese. Dr. Pawl reviewed the claimant's X rays, from which the doctor determined the claimant had a preexisting condition in his lower back which was unrelated to his injury. Dr. Pawl stated that "[b]ecause he has symptoms that are significant in his lateral thigh, I think it is imperative to determine whether or not there is evidence for a nerve root entrapment." The doctor stated in his letter that the claimant's obesity would prevent investigation by either computerized tomographic scanning or magnetic resonance imaging, but that he recommended the claimant undergo a myelogram. Dr. Pawl concluded, "If there is no nerve root involvement, the only disorder in his spine are [sic] the pre-existing degenerative and congenital conditions."

In a letter from Dr. Barry L. Fischer dated June 23, 1989, Dr. Fischer indicated that he had seen the claimant on May 9, 1989. His history of the claimant's back injury was the same as the claimant's testimony of the accident. When Dr. Fischer saw the claimant, he complained of pain in his lower back with numbness in the left thigh. The doctor's examination of the claimant revealed that the claimant was 5 feet 11 inches tall, weighed 300 pounds, had tenderness and spasm to palpation and pressure in the left lumbosacral and paravertebral area, and had spasm radiating on the left side and down the posterior aspect of the left leg, which was indicative of left sciatic radiation. He, too, found the claimant to have limited

range of motion in flexion of his lower back, but, in addition, the doctor determined that the claimant had a positive Lasegue sign on the left. After reviewing the claimant's X rays, Dr. Fischer determined that the claimant had a preexisting condition of spondylolisthesis. Dr. Fischer's diagnosis of the claimant's condition was a lumbosacral strain injury with sciatic radiation of spasm on the left and down the posterior of the left leg. He also stated there was a possible herniated-disc syndrome of the lumbar area.

From the foregoing evidence, the arbitrator held that the claimant failed to prove he had sustained an accidental injury during the course of his employment on March 22, 1989. As was noted previously, the Commission reversed and held that the claimant's injury did arise out of and in the course of his employment and awarded him TTD and medical expenses. The circuit court confirmed the Commission's decision.

On appeal, the respondent first contends that the Commission's decision was against the manifest weight of the evidence. Specifically, the respondent argues that because the claimant was engaged in a normal, daily activity, *i.e.*, bending over, and because the claimant was not exposed to a greater risk than the general public, his injury to his lower back was not an accidental injury for which compensation was payable. The respondent further argues that the claimant's preexisting conditions of his obesity and his spondylolisthesis were the cause of the claimant's current condition of ill-being. The respondent's second issue raised on appeal is that where, as here, the Commission did not consider additional evidence, the Commission failed to give due deference to the arbitrator's decision and, in particular, the Commission did not give weight to the arbitrator's assessment of the witnesses' credibility.

■ In considering the respondent's first contention, that the Commission's determination that the claimant's injury arose out of and in the course of his employment was against the manifest weight of the evidence, we are cognizant that the law in this area is well established. For an injury to "arise out of" employment, the injury must have occurred from some risk connected with, or incidental to, the employment, in order to create a causal connection between the employment and the accidental injury. (*Caterpillar Tractor Co. v. Industrial Comm'n* (1989), 129 Ill. 2d 52, 541 N.E.2d 665; *Hopkins v. Industrial Comm'n* (1990), 196 Ill. App. 3d 347, 553 N.E.2d 732.) If the injury occurs when the employee was performing acts he was instructed to perform by his employer, acts he had a common-law or statutory duty to perform, or acts he might

reasonably be expected to perform incident to his assigned duties, then the injury arose out of his employment. (*Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 541 N.E.2d 665; *Hopkins v. Industrial Comm'n*, 196 Ill. App. 3d 347, 553 N.E.2d 732.) Also, if the employee is exposed to a risk to a greater degree than the general public, the injury is similarly considered to have arisen out of his employment. (*Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 541 N.E.2d 665; *Hopkins v. Industrial Comm'n*, 196 Ill. App. 3d 347, 553 N.E.2d 732.) However, if the employee's exposure to the risk is equal to that of the general public, his injury is not compensable. *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 541 N.E.2d 665; *Hopkins v. Industrial Comm'n*, 196 Ill. App. 3d 347, 553 N.E.2d 732.

Additionally, under the law, an employer takes its employees as it finds them, and a preexisting condition does not bar compensation for an injury if the employment was also a causative factor. (*Quality Wood Products Corp. v. Industrial Comm'n* (1983), 97 Ill. 2d 417, 454 N.E.2d 668.) The only exception to this general rule is that if an employee's health has so deteriorated that any normal daily activity is overexertion, compensation will be denied. *Quality Wood Products Corp. v. Industrial Comm'n*, 97 Ill. 2d 417, 454 N.E.2d 668.

■ In the instant case, the Commission stated its decision was based in pertinent part on the following:

"The objective findings in this case show that Petitioner had a preexisting condition of spondylolisthesis and that he was obese. The doctors all agreed and acknowledged that bending could aggravate this preexisting condition. Respondent's examining physician, Dr. Apfelbach, thought the back pain was secondary to the preexisting condition. Dr. Maniquis also acknowledged that the combination of lifting and sneezing would be stressful on the back and would be more stressful than just one or the other."

This paragraph of the Commission's decision reflected that the Commission found that the claimant's act of bending on March 22, 1989, aggravated his preexisting condition and caused his present condition of ill-being. This determination was not against the manifest weight of the evidence.

The medical evidence presented revealed that the claimant did have the preexisting condition of spondylolisthesis and spondylosis in his lower back; however, as the Commission found, Dr. Maniquis testified that bending, combined with sneezing, presented a stress-

ful situation for the claimant's back. Dr. Apfelbach, the respondent's physician, acknowledged that these activities could temporarily aggravate the claimant's condition. None of the medical evidence presented established that the claimant's condition had so deteriorated that any activity would cause injury, and, in fact, although the claimant's preexisting conditions and his obesity were of a longstanding nature, the claimant had been able to do his work for years without difficulty.

Further, it was a reasonable inference that the claimant's acts of bending required by his work exposed the claimant to a greater degree of risk than that of the general public. Dr. Apfelbach testified that it is not a normal activity to bend from the waist, but that a person must bend his knees when he lifts a part. The claimant's testimony and Lagoo's testimony established that the claimant's work required him to regularly bend from the waist and lift parts weighing between 15 and 40 pounds out of a box and that the location of the box did not enable the claimant to bend his knees while doing this activity. The frequency of this activity and the method in which the claimant had to bend and lift without bending his knees increased the claimant's exposure to risk of injury from the bending than that of the general public, and, thus, the fact that bending is a normal activity did not preclude a finding that the claimant's injury arose out of his employment. The foregoing evidence was sufficient to support the Commission's decision.

The respondent's second contention is that this court must give extra scrutiny to the Commission's decision, since the Commission considered the case without hearing additional evidence. The respondent argues that because the Commission overturned the arbitrator's decision, it is clear that the Commission did not give due deference to the arbitrator's decision and, in particular, the Commission did not give due deference to the arbitrator's determination of credibility. In support of this argument, the respondent cites to this court's decision in *Cook v. Industrial Comm'n* (1988), 176 Ill. App. 3d 545, 531 N.E.2d 379. This argument is without merit.

In a subsequent case, *Dillon v. Industrial Comm'n* (1990), 195 Ill. App. 3d 599, 552 N.E.2d 1082, this court repudiated the statement in *Cook* that a court of review is required to give "extra scrutiny" to a Commission decision overturning the arbitrator's determination without considering additional evidence and reiterated the standard to be applied on review. In *Dillon*, we stated as follows:

"It is well settled that the Commission is the judge of the credibility of the witnesses. [Citation.] It is the peculiar prov-

ince of the Commission not only to determine the credibility of witnesses but also to weigh the testimony and to determine the weight to be given to the evidence. [Citations.] Regardless of whether the Commission hears testimony in addition to that heard by the arbitrator, it exercises original jurisdiction and is in no way bound by the arbitrator's findings." (*Dillon v. Industrial Comm'n*, 195 Ill. App. 3d at 607, 552 N.E.2d at 1087.)

This court further stated in *Dillon* that the Commission's decision will only be overturned on review if its decision is against the manifest weight of the evidence. *Dillon v. Industrial Comm'n*, 195 Ill. App. 3d 599, 552 N.E.2d 1082.

Here, the Commission set forth in its decision that it found the claimant to be credible, since the claimant's testimony about his injury at work was corroborated by the medical evidence. The Commission noted that the only contradiction to the claimant's testimony was provided by the respondent's nurse, which the Commission held was not persuasive in determining the claimant incredible. We do not find that the Commission's determination of credibility was against the manifest weight of the evidence.

For the foregoing reasons, the judgment of the circuit court of Lake County, confirming the Industrial Commission's decision, is affirmed.

Affirmed.

McCULLOUGH, P.J., and WOODWARD and RAKOWSKI, JJ., concur.

JUSTICE STOUDER, dissenting:

I disagree with the result reached by the majority of the court. I believe the decision of the Commission is against the manifest weight of the evidence.

I have no quarrel with the rules as recited by my colleagues. It is the application of those rules to the facts of this case which disturbs me.

So far as I am concerned, the claimant was performing a normal activity at the time of the incident, and he conducted this activity for many years as a matter of course. The additional activity of sneezing, which the medical evidence indicates triggered the incident, is likewise a normal activity. These activities are no different from those of the general public. Even viewing the medical evi-

dence most favorable to the claimant, the most that can be said is that the incident occurred while the claimant was working. Since the activities were normal, the incident could have occurred at some other time and place without being related to the claimant's employment activities. There seems to be a tendency to hold a compensable injury occurs if it happens on the employer's premises. This is not the rule.

I do not believe the evidence shows the activities of the claimant exposed him to risks different from those of the general public, and I would reverse the Commission's result.